FILED & ENTERED

SEP 13 2017

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY RUST        DEPUTY CLERK

**NOT FOR PUBLICATION**

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

NORTHERN DIVISION

| | |
|---|---|
| In re:<br><br>DAVID L. DECRET,<br><br>     Debtor.<br>_____<br>CATHERINE M. WARD, Individually<br>and as trustee of the Ward Living Trust<br>dated 2/23/96,<br><br>     Plaintiff,<br><br>v.<br><br>DAVID DECRET,<br><br>     Defendant.<br>_____ | Case No. 9:16-bk-11356-PC<br><br>Chapter 7<br><br>Adversary No. 9:16-ap-01066-PC<br><br><br><br>**MEMORANDUM DECISION**<br><br>Date: August 18, 2017<br>Time: 9:00 a.m.<br>Place: United States Bankruptcy Court<br>    Courtroom # 201<br>    1415 State Street<br>    Santa Barbara, CA 93101 |

  Catherine M. Ward, Individually and as trustee of the Ward Living Trust dated 2/23/96 ("Ward") seeks a judgment against David Decret ("Decret") denying his discharge in this bankruptcy case pursuant to 11 U.S.C. § 727(a)(4) and determining that her fraud claim against Decret is nondischargeable under 11 U.S.C. §§ 523(a)(2)(A) and (a)(6).[1] Trial of this adversary

---

[1] Unless otherwise indicated, all "Code," "chapter" and "section" references are to the Bankruptcy Code, 11 U.S.C. §§ 101-1330. "Rule" references are to the Federal Rules of Bankruptcy Procedure ("FRBP"), which make applicable certain Federal Rules of Civil Procedure ("F.R.Civ.P."). "LBR" references are to the Local Bankruptcy Rules of the United States Bankruptcy Court for the Central District of California ("LBR").

proceeding was commenced and concluded on August 18, 2017.  Having considered the parties' Pre-Trial Stipulation, the evidentiary record and argument of counsel, the court will enter a judgment in favor of Decret based upon the following findings of fact and conclusions of law made pursuant to F.R.Civ.P. 52(a), as incorporated into FRBP 7052.

## I. STATEMENT OF FACTS

On July 18, 2016, Decret filed a voluntary petition under chapter 7 of the Code.  Sandra McBeth ("McBeth") was appointed as trustee.  In his schedules, Decret disclosed debts in excess of $2,673,378 and the following assets valued at $5,812: (1) 2014 Toyota (leased vehicle) -- $0.00; (2) Household Goods -- $1,500; (3) Clothing -- $2,000; (4) Citibank checking account -- $12; (5) CIC Bank checking account $0.00; (6) Decret Design & Construction Corp. (100% ownership) -- $0.00; (7) Decret Discret Design (100% ownership) -- $0.00; (8) Office Equipment -- $1,000; (9) Hand Tools -- $300; and (10) Inventory -- $1,000.  Ward was listed in Schedule F as the holder of an unliquidated and disputed unsecured non-priority claim in the amount of $2,200,000.  On August 29, 2016, McBeth commenced a meeting of creditors, examined Decret under oath, and concluded the meeting pursuant to 11 U.S.C. § 341(a).  On August 30, 2016, McBeth filed a Trustee's Report of No Assets.

On July 24, 2016, Ward timely filed a complaint in the above referenced adversary proceeding seeking a judgment (a) denying Decret's discharge under 11 U.S.C. § 727(a)(4) for materially false statements allegedly made under oath in his schedules and statements and (b) determining that her fraud claim against Decret based upon electrical and audio-visual work performed as part of a residential remodeling project at 16971 South Pacific Avenue, Sunset Beach, California ("Property"), together with reasonable attorneys' fees and costs, is nondischargeble under 11 U.S.C. §523(a)(2)(A) and (a)(6).  On October 11, 2016, Decret filed an answer to Ward's complaint.  After a trial on August 18, 2017, the matter was taken under submission.

## II. DISCUSSION

This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. §§ 157(b) and 1334(b). This matter is a core proceeding under 28 U.S.C. § 157(b)(2)(A), (I), (J) and (O).[2] Venue is appropriate in this court. 28 U.S.C. § 1409(a). "[E]xceptions to discharge are to be narrowly construed." Quarre v. Saylor (In re Saylor), 108 F.3d 219, 221 (9th Cir. 1997). Furthermore, "[s]ection 727's denial of discharge is construed liberally in favor of the debtor and strictly against those objecting to discharge." First Beverly Bank v. Adeeb (In re Adeeb), 787 F.2d 1339, 1342 (9th Cir. 1986).

A. Decret's Debt To Ward Is Not Nondischargeable Under 11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) excepts from discharge in bankruptcy "any debt for money, property, services, or an extension, renewal, or refinancing of credit to the extent obtained by false pretenses, a false representation, or actual fraud." 11 U.S.C. § 523(a)(2)(A). To establish that a debt is nondischargeable under 11 U.S.C. § 523(a)(2)(A), the plaintiff must show by a preponderance of the evidence that (a) debtor made a representation; (b) at the time, debtor knew the representation was false; (c) debtor made the representation with the intention and purpose of deceiving the creditor; (d) the creditor justifiably relied on the debtor's representation, and (e) the creditor sustained the alleged loss and damage as the proximate result of such representation. Ghomeshi v. Sabban (In re Sabban), 600 F.3d 1219, 1222 (9th Cir. 2010); Diamond v. Kolcum (In re Diamond), 285 F.3d 822, 827 (9th Cir. 2002). Because direct evidence of intent to deceive is rarely available, the "intent to deceive can be inferred from the totality of circumstances, including reckless disregard for the truth." Gertsch v. Johnson & Johnson Fin. Corp. (In re Gertsch), 237 B.R. 160, 167-68 (9th Cir. BAP 1999); see Household Credit Servs., Inc. v. Ettell

---

[2] Although the claims made the basis of Ward's complaint do not constitute "Stern claims," the parties prior to trial nevertheless expressly consented to the entry of a final judgment by the bankruptcy court. See Joint Status Report [Dkt. # 25] filed October 24, 2016. "Stern claims," so named after the Supreme Court's decision in Stern v. Marshall, ___ U.S., ___, 131 S.Ct. 2594, 180 L.Ed.2d 475 (2011), "are claims 'designated for final adjudication in the bankruptcy court as a statutory matter, but prohibited from proceeding in that way as a constitutional matter.'" Mastro v. Rigby, 764 F.3d 1090, 1093 (9th Cir. 2014) (citation omitted).

1  (In re Ettell), 188 F.3d 1141, 1145 (9th Cir. 1999) ("Because fraud lurks in the shadows, it must
2  usually be brought to light by consideration of circumstantial evidence.").
3       A debt may be nondischargeable under 11 U.S.C. § 523(a)(2)(A) "when a debtor makes
4  promises of future action which, at the time they were made, he had no intention of fulfilling."
5  Bank of La. v. Bercier (Matter of Bercier), 934 F.2d 689, 692 (5th Cir. 1991) (quoting Keeling v.
6  Roeder (In re Roeder), 61 B.R. 179, 181 (Bankr. W.D.Ky. 1986) (emphasis in original)).  In
7  other words, "[a] promise of future conduct is actionable as fraud only if made without a present
8  intention to perform."  S. Union Co. v. Sw. Gas Corp., 180 F.Supp.2d 1021, 1031 (D. Ariz.
9  2002) (quoting Magpali v. Farmers Group, Inc., 48 Cal.App.4th 471, 481 (1996)); see Tenzer v.
10 Superscope, Inc., 39 Cal.3d 18, 30 (1985) ("[S]omething more than nonperformance is required
11 to prove the defendant's intent not to perform his promise." (citation omitted)).  Conversely, "if,
12 at the time he makes a promise, the maker honestly intends to keep it but later changes his mind
13 or fails or refuses to carry his expressed intention into effect, there has been no
14 misrepresentation."  Palmacci v. Umpierrez, 121 F.3d 781, 787 (1st Cir. 1997).[3]  "[F]raud may
15 be inferred from an immediate failure to perform a promise," but "initial performance in
16 accordance with [a promise] negates any possible inference of fraud."  Kaylor v. Crown
17 Zellerbach, Inc., 643 F.2d 1362, 1368 (9th Cir. 1981) (emphasis added).
18      With respect to construction contracts, the "[f]ailure to fulfill a contractual obligation by
19 itself does not establish a misrepresentation for purposes of § 523(a)(2)(A)."  Rezin v. Barr (In re
20 Barr), 194 B.R. 1009, 1017 (Bankr. N.D. Ill. 1996); see Tenzer, 39 Cal.3d at 31 ("[I]f [a]
21 plaintiff adduces no further evidence of fraudulent intent than proof of nonperformance of an
22 oral promise, he will never reach a jury.").  Nor is a debt nondischargeable under 11 U.S.C. §

---

[3] "The test may be stated as follows.  If, at the time he made his promise, the debtor did not intend to perform, then he has made a false representation (false as to his intent) and the debt that arose as a result thereof is not dischargeable (if the other elements of § 523(a)(2)(A) are met).  If he did so intend at the time he made his promise, but subsequently decided that he could not or would not perform, then his initial representation was not false when made."  Id. (emphasis in original).

523(a)(2)(A) simply because the contractor was unlicensed at the time the construction agreement was executed. See Sabban, 384 B.R. at 7-8 ("Because the $123,000 disgorgement of compensation under [Ca. Bus. & Prof. Code] § 7031(b) did not arise or flow from Debtor's fraudulent conduct, the bankruptcy court correctly held that section 523(a)(2)(A) did not apply to that debt."), aff'd, 600 F.3d 1219 (9th Cir. 2010).

> In home construction cases, nondischargeability on the grounds of fraud has been found in cases where builders/debtors used money from draws on one job to pay materialmen on other jobs, or where there was no performance at all and an intent not to perform from the beginning was found . . . . It has not been found in cases where all that has been proven is a failure to fulfill a promise, without proof of an intent to break the promise at the time it was made.

Soukup v. Ionna (In re Ionna), 74 B.R. 255, 260 (Bankr. S.D. Ohio 1987) (internal citations omitted).

1. <u>Decret's Alleged Misrepresentations</u>.

The gist of Ward's claim is that Decret, who has extensive experience designing and installing audio-visual, lighting and automation systems, took unfair advantage of Ward, a homeowner and ostensibly unsophisticated consumer, by designing, wiring and equipping for installation audio-visual, lighting and automation systems for the Property that were far more extensive and complex than reasonably necessary for an ordinary residential application, and that he did so with the specific intent to deceive Ward and to fleece her of nearly $2.6 million. The Pre-Trial Stipulation does not identify facts, either agreed or contested, regarding the time, place and manner of any <u>specific statement</u> allegedly made by Decret to Ward, or the substance of the statement itself, which Ward believes was false, made by Decret with the intent to deceive, and upon which Ward justifiably relied to her detriment. Instead, the Pre-Trial Stipulation states the following:

> 1. Ward contracted with Decret to perform design and construction services related to the remodel of her home . . , specifically electrical and audio-visual work.

> 2. In the course of Decret's performing the work at Ward's residence, <u>Decret represented to Ward that the equipment specified by Defendants was necessary to the project as designed by Defendants</u>.

5

  3. Unbeknownst to Ward, much of that equipment was entirely unnecessary and, in fact, grossly excessive in light of the size of the residence and taking into consideration the capabilities of the equipment and Ward's audio-visual requirements.

  4. Ward, having no expertise in matters relating to audio-video or other low-voltage installations, relied on Decret to inform her of the appropriateness of the equipment for her home.[4]

Ward does not allege that Decret concealed material facts from her regarding the scope of the project, the labor performed, the materials furnished, or the cost of the labor and materials to do the job.

  During trial Ward did not introduce evidence of a false statement or representation by Decret to Ward regarding the necessary of particular equipment to the project as designed. In response to the court's inquiry during trial seeking some specificity regarding Decret's alleged false representations, Ward's counsel stated that "the representations that were made by Mr. Decret to the Wards were that each of the items that were contained on the list of equipment that were ordered, in particular the Crestron equipment order, were necessary to the project." At some point, according to Ward's testimony, Decret made the substance of the foregoing statement to Ward. However, Ward did not submit evidence regarding the date, time and place of the alleged statement; and most importantly, Ward did not establish by a preponderance of the evidence that the statement was false or made with the intent to deceive.

  The Property is located on the beach in Sunset Beach. Ward acquired the Property for $1.6 million in 1996. In 2012 Ward elected to renovate the Property with the assistance of ACM, Ward's general contractor, Adaline Fagan, Espace Design at Bergmot Station, who was Ward's interior designer on the project, an architect, and numerous subcontractors. The renovation project lasted over two years during which the existing improvements were essentially torn down and replaced by a 4,000 to 5,000 square foot home at a cost of nearly $15

---

[4] Pre-Trial Stipulation [Dkt. # 61] filed August 11, 2017 ("Trial Stip."), at 2:16-3:1 (emphasis added). The reference to "Defendants" is misleading. Decret is the only defendant in this adversary proceeding.

million. The renovation included: (1) $500,000 for a custom-fabricated aquarium; (2) $1 million for a kitchen which included cabinets and millwork from Studio Becker and an island that could be raised and lowered; and (3) an elevator which rose three floors to a view of the ocean. Ward was referred to Decret by or through Fagan.

On July 12, 2012, Ward and Decret met for the first time regarding an audio-visual system, automation, and other improvements to the Property. By letter dated July 24, 2012, Decret Design confirmed that Ward had retained it "[t]o complete all aspects of Automation for both low and high voltage for the Ward Residence Project, Sunset Beach, CA."[5] Decret testified that Decret Design is a d/b/a of Priam LLC ("Priam"). The scope of the work included: Electrical (high V); Lighting Control (low V); Audio Distribution; Video Distribution; Shades Control; HVAC Control; CCTV; Alarm; Phone (PBX); Intercom; Fire Place; Kitchen Household hardware control; Network/VPN, and Wireless.[6] Decret Design agreed to: (1) provide complete sets of plans/Design including all wiring schematic, hardware locations and pricing; (2) provide and install all wires and hardware necessary for both low voltage and high voltage automation; (3) provide technical support and tutorial; (4) provide manufacturer's warranty on all products provided and installed; and (5) collaborate with ACM, Espace Design, Studio Becker and other parties involved in order to complete the project.[7]

The July 24th letter stated that "[p]ayments structure and schedule will be provided along with Plans, Design and Pricing," and requested payment of the "[f]irst installment" of $50,000 to Decret Design for commencement of the work. The July 24th letter called for the signatures of Ward and the "Automation Engineer Decret Design." Decret testified that he signed the July 24th letter as president of Priam. A signature appears on the letter, but there is no statement regarding the capacity in which the letter was signed. Ward did not sign the July 24th letter, but

---

[5] Exhibit 1, at 1.

[6] Id. at 2.

[7] Id. at 1.

she paid the $50,000 installment sought in the letter by wire transfer directly into an account held by Decret Design/Priam LLC and work commenced on the project.

Despite the extensive work contemplated by the July 24th letter, the agreement between Decret Design and Ward for the audio-visual system, automation, and other work at the Property was never reduced to a formal written agreement executed by the parties – one which (1) explained in detail the systems to be installed; (2) identified specifically the work to be performed, the equipment necessary for the systems, and the cost of the job; and (3) required the parties to execute written change orders if the system design, job requirements, equipment or price changed during the course of construction and installation.  The evidentiary record regarding the construction agreement consists largely of the July 24th letter, copies of emails between the parties, and copies of invoices submitted to and paid by Ward.

Decret testified that he communicated with both Fagan and Ward regarding the work to be performed by Decret Design.  Ward testified that Fagan "spoke with authority" for Ward regarding the "look, fit and finish of the inside of the home."  Fagan's email to Decret on October 13, 2012, supports the conclusion that the parties contemplated Decret Design completing the work outlined in the July 24th letter on a "cost plus" basis, and that such work, even at that early stage, was expected to cost upwards of $1.5 million.[8]

Decret testified that Decret Design & Construction, Inc. ("DDC") was formed in late 2012 or early 2013 to meet the criteria set by ACM, Ward's general contractor, for subcontractors on the Ward remodeling project.  DDC obtained the necessary insurance and contractor's licenses – an electrical license and a low voltage license – to do the work called for by the July 24th letter.

---

[8] Exhibit A, at 2. Fagan wrote: "[K]eep in mind that you can be very open with Cathy Ward.  It can be very transparent.  Cost plus 25% and then you don't have to run around and hide figures.  Your best price plus 25%.  You can even show her your cost invoices.  I feel that this is a great job for you and will be a showcase of your work but you must keep some time frames.  It is essential.  The reason that you were hired is because the last person to work on this did not perform.  We are talking 1 to 1.5 million dollars David so lets step It up please."  Id.

8

Decret testified that he was never given a budget by Ward or told that he had to complete the project for a fixed price. Decret testified he met with Ward and Fagan in July 2012 and was told that Ward was building a "one of a kind, state of the art home." There was no budget. In response to questions from Ward's counsel, Decret testified that "the Wards told me about the features they wanted. It was my job to make those features happen."

Decret testified that the work included the installation of three 42" screens in the elevator which would permit passengers to view the aquarium from cameras embedded in the aquarium as they rose to the third floor; and on the third floor, the screens would give passengers a 360 degree view of the ocean. Decret testified that Ward wanted these features in the elevator and that she knew they would be expensive. Ward admitted that she discussed with Decret the concept of an elevator that, during the course of travel, would project on three screens the ocean and the aquarium, but testified that "it was too much with three screens so it was never included."

Decret testified that he was asked to install an energy assumption monitoring system that would permit Ward to monitor at all times the energy output in the house "per floor, per room." He also testified that the original plan called for an 80-90 inch television screen in the living room. Due to the artwork that was to be placed on the walls, however, the plan was modified and a home theater system was designed that required the installation of a 120-130" drop-down screen, a drop-down projector, speakers coming out of the floor, and "basically with the push of a button you would be able to view your TV/home theater, and when you didn't want to use it your living room was completely intact of any technical features." Decret testified that the Wards wanted to watch up to four sources of video on a TV at one time. He testified that this feature was not available in every bedroom in the house and that it would be available only in four or five areas of the house where there were major size displays, but that these features were explained to the Wards and "thoroughly wanted."

Crestron Electronics, Inc. ("Crestron") designs, engineers, manufactures, and supplies automation, audio-visual, and lighting control systems for commercial buildings and residences. Decret and Ward contemplated installing Crestron equipment as part of the Ward project from its

9

inception. Decret testified that the Wards owned a yacht, that he had been on the yacht, and that it had a Crestron-based audio-visual system. Ward testified that she owned a 127-foot "fishing boat" that employed a full-time crew of 5. Ward testified that she and Decret "talked about Crestron at the get-go because it was the . . . equipment or interface with the stuff [that] we used on the boat . . . so there was familiarity there with it." Ward testified that the plan was to download all of the video and audio from the boat system and upload it on system being installed on the Property.

Decret's testimony regarding the audio-video system planned for the Ward residence was corroborated by Tom Milpacher, a Crestron Platinum-Certified Programmer, who worked on the Ward project with Priam and DDC. In response to questions regarding the propriety of a 64 x 64 switcher for residential use, Milpacher testified that he was aware of 64 x 64 switchers used in residential applications and that a 64 x 64 switcher was appropriate for the Wards' project due to the quantity of video zones serviced by their system, particularly on the input side. Milpacher testified that Decret was installing a system to service 12 to 14 locations for touch screens and at least three locations had been discussed in meetings for quad displays on the screens. He further testified that Fagan was adamant about having some type of "statement display" in the living room.

Ward, on the other hand, denied ever using the words "state of the art" to describe the audio-visual system sought for the Property. She testified that she rejected the idea of more than one video source and did not ask to be able to watch various programs on one screen. She testified that her husband watched television constantly and that it was important to have a user-friendly system with screens in various areas of the house where he might be spending most of his time. Ward stated that she understood installation of a good audio system would be a problem because of the open spaces in the house, but testified that neither she nor her husband were audiophiles and that audio was not as important as the video system.

Ward testified that during construction she met weekly for about two hours with ACM and subcontractors who were doing significant work at the time on the Property, including Decret. Milpacher testified that he participated in on-site meetings that included the Wards,

Fagan, Fagan's assistant, and Decret. Many of the meetings and work sessions that took place between June 2012 and February 2013 were summarized in Decret Design's Invoice # 21009 dated March 17, 2013. Milpacher stated that "there was an express desire for the system to be state of the art." He testified that the Wards were not unhappy clients and that there were never concerns expressed about the cost.

Decret testified that he billed Wards every month on behalf of Decret Design and later DDC; and during the last two or three months, Wards was billed every two weeks. Decret testified that Ward saw and approved each invoice before the equipment described in the invoice was purchased. Ward paid each bill and never complained about the bills. Ward admitted on cross-examination that the parties had not agreed upon a specific price or amount to complete the project, and that at no point during the job did she specify that the work was to be completed for a particular amount. She admitted that she was billed for work performed and material furnished not less than monthly, and that she paid each bill promptly and without complaint. Ward testified that she received 90% of the invoices by email. Ward also confirmed that she never wrote a check to Decret individually. Payments for all invoices were wired to either an account held by Decret Design/Priam LLC or later to an account held by DDC. Decret testified that he never received a check from Crestron for equipment that was returned and never used a credit from Crestron for returned equipment on another job.

Ward claimed that Decret never explained to her the necessity of each of the items of equipment listed in Decret Design's Invoice # 19887 dated March 18, 2013. Milpacher testified that he sent a list of questions by email entitled "Ward Questions" to Decret dated March 6, 2013, and based on Ward's answers to those questions prepared the list of equipment necessary for the project contained in Decret Design's Invoice # 19887. Milpacher testified that he met with the Wards at an apartment and went through the Ward Questions. Ward did not recall a direct conversation with Milpacher regarding the Ward Questions. However, Ward admits receiving Invoice # 19887 before Decret ordered the equipment described therein and paying promptly and without inquiry the $539,963.99 sought in the invoice. Decret's counsel asked:

11

> At that point, you didn't say to him – "God, we don't need a Cameo Keypad, Flush Mount, White Textured," correct?
>
> No.
>
> Because really, you were telling him how the house was supposed to be and it was his job to figure out what equipment was needed to make it the way you wanted it?
>
> Yes.

Ward testified that she was unhappy with her architect. She stated that she paid him one-half million dollars, but that he was not responsive with updated drawings and made everyone else's work more difficult. Decret testified that the project was delayed and evolved over time because the architect was not supplying the correct plans, changes were made as construction progressed, including changes to the HVAC system, and Decret and other subcontractors had to adapt and modify their work as changes were made to the construction project itself. Decret testified that he needed accurate architectural plans to properly run conduit and wiring, place light fixtures, and allocate speakers on the Ward project.

On October 4, 2013, Decret emailed Ward "invoices for labor for the last 2 weeks of September and invoice for electrical gear."[9] In the email Decret stated that "[i]n order to make it as simple as possible for you to track, I have highlighted in yellow our 'blueprint of expenses' we discussed, and will do the same as we go forward."[10] Decret's email also included a discussion of the items he was working on: (1) "speakers replacement option and will keep you posted asap;" (2) "Smart glass verification/light control/in library for media room solution;" (3) "Actual media room/projector/screen/proposal for Library;" (4) "Scheduling meeting with Rob and I at Espace to verify locations of receptacles and more, once done will check with you for your approval;" and (5) "Racks Server room/options to move 1 of the 5 racks from downstairs to

---

[9] Exhibit F, at 1.

[10] Id.

3rd floor upstairs, sine [sic] water purification system has been moved out, per Mark's info's."[11] Ward admitted that she did not tell Decret to scale back the project at that point and paid the October 13th invoice without question. Ward admitted that she had no discussion with Decret regarding the nature and extent of the project or the amount of money spent until early 2014.

By email to Decret, Fagan and Mark Fowler dated February 21, 2014, Ward stated:

> I have been contemplating the issues around our home rebuild, and as I said yesterday, the finger-pointing starts and stops with my finger pointed directly at myself. I really have retired from active employment and thought I could hire people I trust and then assume all would act in good faith and with our best interests in mind and I could go on automatic. Well, that was naïve and not very smart, <u>not that any of you have acted in an inappropriate manner</u>, I never should have relinquished my responsibility with each of you, my contractors, to assume responsibility of me and George.[12]

When Ward elected to scale back DDC's work, the only item that she eliminated from the project was the telephone system (PBX). Ward fired DDC less than three months later.

The court as the trier of fact must judge the credibility of witnesses and weigh the evidence accordingly. <u>See, e.g.</u>, <u>Bose Corp. v. Consumers Union of U.S., Inc.</u>, 466 U.S. 485, 512 (1984) ("When the testimony of a witness is not believed, the trier of fact may simply disregard it."); <u>Moore v. Chesapeake & O. Ry. Co.</u>, 340 U.S. 573, 576 ("[I]t is the jury's function to credit or discredit all or part of the testimony.").

Based upon the foregoing, the court finds that it was Decret Design's intention to fully perform its duties as set forth in the July 24th letter when Decret signed the letter on behalf of Decret Design. Decret did not induce Ward to enter into the contract. Rather, Ward's interior designer, Fagan, sought out Decret on behalf of Ward and arranged the meeting between Decret and Ward that resulted in the July 24th letter. There was no evidence that Decret set out to lie, cheat or steal from Ward. Ward testified that Decret represented to her that each of the items

---

[11] <u>Id.</u> at 2.

[12] Exhibit G, at 1 (emphasis added).

ordered were necessary to the project, but she failed to establish by a preponderance of the evidence that such statement was false and made by Decret with the intention to deceive.

Problems arose during the construction project. Ward's architect redrafted and changed plans which caused delay and increased costs. There was a problem with the HVAC system that delayed construction and required Decret to modify the wiring and conduit scheme for the automation and audio-visual systems as it was being installed on the Property. Ward and Decret failed to properly document the automation, lighting and audio-visual systems to be installed as part of the project and then failed to properly document changes to the work as construction progressed, which resulted in conflicting testimony about the features to be included in the completed audio-visual system.

There was exhaustive testimony about (1) the items that were ordered from Crestron; (2) the items that were returned to Crestron; (3) the type and amount of credits received from Crestron for returned items; (4) how such credits were applied by Crestron either at the behest of Decret Design or DDC; and (5) items that were paid for by Ward but not shipped by Crestron. There was also testimony about (1) items paid for by Ward which were either not available or for which a replacement would not be made; (2) whether a credit was given for such products by the supplier, and (3) who received the benefit of such credit, of any. The fact that certain equipment was never ordered or later returned to the manufacturer without a refund to Ward may support a claim for breach of contract, but does not, of and by itself, establish that Decret made a false statement to Ward about the necessity of equipment to the project or a nondischargeable claim under § 523(a)(2)(A).

In sum, the issues between Ward and Decret resulted not from fraud, but the excess cost of the project stemming from the failure of Ward and Decret Design or DDC to have a meeting of the minds regarding the nature and extent of the work to be performed. See Cripe v. Mathis (In re Mathis), 360 B.R. 662, 668 (Bankr. C.D. Ill. 2006) (holding that an $88,000 judgment based upon a "cost plus" construction contract was not nondischargeable under § 523(a)(2)(A)

because the damages were attributable to "workmanship and the excessive cost of the project rather than issues of fraud.").

2. <u>Justifiable Reliance</u>

"[A] creditor must prove justifiable reliance upon the representations of the debtor." <u>Eugene Parks Law Corp. Defined Benefit Pension Plan v. Kirsh (In re Kirsh)</u>, 973 F.2d 1454, 1460 (9th Cir. 1992). "Justification is a matter of the qualities and characteristics of the particular plaintiff, and the circumstances of the particular case . . . ." <u>Field v. Mans</u>, 516 U.S. 59, 71 (1995). "In determining that issue, the court must look to all of the circumstances surrounding the particular transaction, and must particularly consider the subjective effect of those circumstances upon the creditor." <u>Kirsh</u>, 973 F.2d at 1460. But "a person 'is required to use his senses, and cannot recover if he blindly relies on a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation.'" <u>Field</u>, 516 U.S. at 71 (quoting Restatement of Torts (Second) § 541, Comment a).

Because there was no misrepresentation, there can be no justifiable reliance. At most, Ward has demonstrated a contractual dispute with Decret Design or DDC and, as previously stated, a mere breach of contract does not render a debt nondischargeable under 11 U.S.C. § 523(a)(2)(A). Had it reached the issue, however, the evidence does not support a finding of justifiable reliance. Ward is not an unsophisticated consumer. Ward was a sophisticated and well-compensated business person. Ward is now retired, but shortly before the remodeling project commenced Ward's occupation involved investment administration. Ward testified that she supervised 30-40 employees and administered "one of the largest mutual funds in the country" with transactions in the "$100s of millions." Based on her business experience, Ward could and should have taken steps to protect herself by demanding that (a) the terms of the agreement, including the nature and scope of the work to be performed, be reduced to writing; (b) the job be completed for a fixed price; and (c) any modifications to the nature and scope of the work, including the price, be documented by a change order signed by the parties. Ward had

15

the opportunity to question Decret regarding the monthly statements received from Decret Design and later DDC for work performed, equipment purchased and materials furnished in conjunction with the project, but declined to do so and paid each statement promptly and without inquiry.

Having parsed through the conflicting testimony and documentary evidence, the court finds that Ward has not established by a preponderance of the evidence that Ward's claim against Decret for alleged fraud is nondischargeable under 11 U.S.C. § 523(a)(2)(A).

B. Decret's Debt to Ward Is Not Nondischargeable Under 11 U.S.C. § 523(a)(6).

Section 523(a)(6) bars discharge in bankruptcy of any debt "for willful and malicious injury by the debtor . . . ." 11 U.S.C. § 523(a)(6). Section 523(a)(6) requires separate findings on the issues of "willful" and "malicious." Carrillo v. Su (In re Su), 290 F.3d 1140, 1146 (9th Cir. 2002). "[T]he 'willful' injury requirement of § 523(a)(6) is met when it is shown either that the debtor had a subjective motive to inflict injury *or* that the debtor believed that injury was substantially certain to occur as a result of his conduct.'" Id., at 1144 (quoting Petralia v. Jercich (In re Jercich), 238 F.3d 1202, 1208 (9th Cir.) (emphasis in original), cert. denied, 533 U.S. 930 (2001)). "A 'malicious injury' involves '(1) a wrongful act, (2) done intentionally, (3) which necessarily causes injury, and (4) is done without just cause or excuse.'" Jercich, 238 F.3d at 1209) (citation omitted).

Ward's case in chief and final argument focused almost exclusively on her claim under 11 U.S.C. § 523(a)(2)(A). The Pre-Trial Stipulation does not identify any facts, admitted or contested, which form the basis for Ward's claim under 11 U.S.C. § 523(a)(6) nor were the elements of this claim analyzed in her trial brief or explained in final argument.[13] Hence, Ward's 11 U.S.C. § 523(a)(6) claim evidently hinges on the alleged fraud for which a determination of nondischargeability is sought under 11 U.S.C. § 523(a)(2)(A).

---

[13] Ward's Trial Brief simply recites the statutory language of 11 U.S.C. § 523(a)(6) and relevant Ninth Circuit authority interpreting 11 U.S.C. § 523(a)(6). It does not discuss the facts of the case and evidence in the record to show that the elements of 11 U.S.C. § 523(a)(6) are satisfied. See Plaintiff's Trial Brief [Dkt. # 57-3] filed July 28, 2017 ("Ward Brief"), at 5:26-6:13.

1       Section 523(a)(6) requires proof of that the debtor committed an intentional tort.  See Kawaauhau v. Geiger, 523 U.S. 57, 61 (1998).  "The injury itself must be deliberate or intentional, 'not merely a deliberate or intentional act that leads to injury.'"  Bino v. Bailey (In re Bailey), 197 F.3d 997, 1000 (9th Cir. 1999) (quoting Kawaauhau, 523 U.S. at 61).  In this case, Ward's claim under 11 U.S.C. § 523(a)(6) is predicated upon Decret's alleged actual fraud in conjunction with the electrical and audio-visual work performed at the Property.  Having failed to establish that Decret made the false representations alleged in the Pre-Trial Stipulation, the court must also find that Ward has failed to establish that Decret's debt to Ward is nondischargeable under 11 U.S.C. § 523(a)(6).

C. Decret's Discharge Will Not Be Denied Under 11 U.S.C. § 727(a)(4).

       Section 727(a)(4) authorizes the court to deny a chapter 7 discharge to a debtor who "knowingly and fraudulently" makes a false oath "in or in connection with the case." 11 U.S.C. § 727(a)(4)(A).  "The fundamental purpose of § 727(a)(4)(A) is to insure that the trustee and creditors have accurate information without having to conduct costly investigations."  Fogel Legware of Switzerland v. Wills (In re Wills), 243 B.R. 58, 63 (9th Cir. BAP 1999).  To prevail under § 727(a)(4)(A), "the plaintiff must show that (1) the debtor made a false oath in connection with the case; (2) the oath related to a material fact; (3) the oath was made knowingly; and (4) the oath was made fraudulently."  Roberts v. Erhard (In re Roberts), 331 B.R. 876, 882 (9th Cir. BAP 2005).

       "A false oath may involve a false statement or omission in the debtor's schedules."  Wills, 243 B.R. at 62.  "A false statement is material if it bears a relationship to the debtor's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the debtor's property."  Id.  "A false statement or omission may be material even in if it does not cause direct prejudice to creditors."  Id. at 63.  "An omitted asset may ultimately be found to have no value, but its disclosure is necessary 'if it aids in understanding the debtor's financial affairs and transactions.'"  Stanley v. Hoblitzell (In re Hoblitzell), 223 B.R. 211, 215-16 (Bankr. E.D. Cal. 1998) (citation omitted).

17

1          "A debtor 'acts knowingly if he or she acts deliberately or consciously.'"  Khalil v.
2  Developers Surety & Indemnity Co. (In re Khalil), 379 B.R. 163, 173 (9th Cir. BAP 2007)
3  (quoting Roberts, 331 B.R. at 883), aff'd, 578 F.3d 1167 (9th Cir. 2009).  Fraudulent "[i]ntent is
4  usually proven by circumstantial evidence or by inferences drawn from the debtor's conduct."
5  Retz v. Samson (In re Retz), 606 F.3d 1189, 1199 (9th Cir. 2010).  "Reckless indifference or
6  disregard for the truth may be circumstantial evidence of fraud, but is not sufficient alone, to
7  constitute fraudulent intent."  Id.; see Roberts, 331 B.R. at  884 ("A false statement resulting
8  from ignorance or carelessness does not rise to the level of 'knowing and fraudulent.'").

9          As previously stated, Ward's case in chief and final argument focused almost exclusively
10 on her claim under 11 U.S.C. § 523(a)(2)(A).  The Pre-Trial Stipulation does not identify any
11 facts, admitted or contested, which form the basis for Ward's 11 U.S.C. § 727(a)(4) claim and
12 the elements of this claim were not explored in her trial brief or explained in final argument.[14]

13         At trial Ward questioned Decret regarding his failure to disclose in Schedule B(34) a
14 cross-action filed by DDC in Case No. 30-2014-00725830-CU-BT-CJC, Ward v. Decret, et al.,
15 in the Superior Court of California, County of Orange, that was pending on the petition date.  A
16 copy of the cross-complaint was not introduced into evidence or made part of the record.
17 According to the testimony, the claim made the basis of the cross-complaint was owned by
18 DDC, not Decret.  Schedule B(34) required Decret to disclose "other contingent and unliquidated
19 claims of every nature, including counterclaims of the debtor and rights to set off claims."
20 Schedule B(34) did not require Decret to disclose counterclaims owned by a corporation in
21 which he held an interest on the petition date.  Moreover, Decret disclosed in Schedule B(19) and
22 in Statement of Financial Affairs, Question # 27 that he owned an interest in DDC which was
23 valued at zero.  Decret testified at trial that his valuation of DDC in the schedules and statements
24 was accurate, notwithstanding the cross-complaint asserted in the state court action, because the

---

[14] Ward's Trial Brief simply recites the statutory language of 11 U.S.C. § 727(a)(4) and relevant Ninth Circuit authority interpreting 11 U.S.C. § 727(a)(4).  It does not discuss the facts of the case and evidence in the record to show that the elements of 11 U.S.C. § 727(a)(4) are satisfied.  See Ward Brief, at 6:14-28.

18

claims asserted against DDC in the case exceeded $2 million. Decret further testified that DDC was not represented by counsel in the state court action, and that DDCs right to do business in California had been suspended prior to bankruptcy, so it did not have the right to defend the action or pursue the cross-action on the petition date. There was no evidence to the contrary.

Ward next questioned Decret regarding the $60,000 disclosed in Statement of Financial Affairs, Question # 4 as gross income received from the operation of a business in 2014. Decret testified that the figure was an accurate statement of his gross income for 2014. He acknowledged that Decret Design and DDC had received more than $60,000 from Ward for work performed and materials furnished at the Property in 2014, but there was no evidence that his personal gross income for 2014 exceeded the amount disclosed in the statement of financial affairs.

Finally, Ward pointed to the fact that Decret had not disclosed his ownership interest in Priam in Schedule B(19) filed under oath on July 18, 2016, as amended on August 31, 2016. Decret testified that his schedules and statements were prepared by his attorney, that he reviewed them before they were signed and filed in his bankruptcy case, and that he "had no idea" why he had not disclosed his ownership interest in Priam in Schedule B(19). Decret also testified that Priam was defunct on the petition date. Priam was engaged in business "from about 2004 to 2012-13," according to Decret, but it had stopped doing business after the formation of DDC "in the latter part of 2012 or early part of 2013" and forfeited its right to do business in California.

The court finds that Decret's disclosure in Schedule B(19) was incomplete, and that the omission regarding his ownership interest in Priam was material because it bore a relationship to the debtor's estate and the debtor's business transactions. However, the court cannot find on the basis of the record that such omission was made either knowingly or fraudulently. Recklessness by itself will not suffice, but recklessness combined with other circumstances can support an inference that he acted with knowing and fraudulent intent. Khalil, 379 B.R. at 177 ("The bankruptcy court found that Debtor made numerous, substantial, and conscious omissions from his bankruptcy schedules and statement of financial affairs, that Debtor's explanations were not

persuasive, that he chose not to correct these inaccuracies when he had the opportunity, and that he had the requisite intent to deceive."). Ward has not shown such circumstances in this case. There is no evidence of any material misstatement or omission in Decret's schedules or statements, other than his failure to disclose in Schedule B(19) his interest in Prium, a defunct corporation which ceased doing business three and one-half years prior to bankruptcy. Accordingly, Ward has failed to establish that Decret's discharge should be denied under 11 U.S.C. § 727(a)(4)(A).

## CONCLUSION

For the reasons stated, the court will enter a judgment in favor of Decret dismissing Ward's claims with prejudice.

A separate judgment will be entered consistent with this memorandum.

###

Date: September 13, 2017

Peter H. Carroll
United States Bankruptcy Judge